FILED
4/1/20 8:38 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Case No. 17-22147-GLT |
| | : | Chapter 7 |
| **RONALD S. JONES**, | : | |
| | : | |
| *Debtor.* | : | |
| | : | |
| | : | |
| **TERRI PATAK**, | : | |
| | : | |
| *Plaintiff,* | : | Adv. Pro. No. 17-02222-GLT |
| | : | |
| v. | : | |
| | : | |
| **RONALD S. JONES**, | : | |
| | : | |
| *Defendant.* | : | |
| | : | |

Joseph Lavara, Esq.                           Glenn R. Bartifay, Esq.
Samuel L. Grego, Esq.                         Bartifay Law Offices, P.C.
Linda Hernandez, Esq.                         Murrysville, PA
Dickie, McCamey & Chilcote, P.C.              *Attorney for the Defendant*
Pittsburgh, PA
*Attorneys for the Plaintiff*

### <u>MEMORANDUM OPINION</u>

The debtor, Ronald S. Jones, entered into an *Asset Purchase Agreement* with the plaintiff, Terri I. Patak, to acquire most of the contents in her jewelry store.[1]  After taking possession of the store location and its assets, Mr. Jones and his wife, Grace M. Betancourt-Jones, opened their own jewelry shop, Grace Gems, but they eventually defaulted on the obligations under the APA and sought bankruptcy relief.  Ms. Patak argues that Mr. Jones'

---

[1]     The parties to the *Asset Purchase Agreement* dated February 2, 2014 (the "APA") include Ms. Patak as "prospective seller" and Grace Gems Galeria, LLC [sic], Mr. Jones, and Grace Betancourt Jones as "prospective buyers."  Ex. A.  The business was formed as "Grace Gems Galeria, LLC," but has been repeatedly referenced as "Grace Gems Galleria, LLC" in this and other proceedings.  <u>Compare</u> Ex. C, <u>with</u> *Chapter 11 Voluntary Petition*, Case No. 15-24218, Dkt. No. 1.  Although the spelling has no impact on its decision, the Court will refer to the entity as "Grace Gems" in this *Memorandum Opinion*.

actions, both before and during his operation of Grace Gems, preclude a discharge under 11

U.S.C. § 727.[2]  Alternatively, Ms. Patak asserts that the debt she is owed should be excepted

from discharge under section 523(a)(2)(A).  For the reasons set forth below, the Court will deny

Mr. Jones a discharge and holds that any debt owed by Mr. Jones to Ms. Patak is otherwise

nondischargeable.

## I.    BACKGROUND

Robert Patak operated a jewelry, mineral, and fossil business known as Shadyside

Mining Company out of a storefront on Copeland Street in the Shadyside neighborhood of

Pittsburgh.[3]  Upon his passing in 2010, the store and its contents were left to Ms. Patak, his

surviving wife.[4]  Ms. Patak operated the store by herself for nearly a year and eventually hired

Ms. Betancourt-Jones to be the store manager, making her responsible for general store

operations, including most sales and hiring activities.  The store was only modestly profitable

and generated net income of no more than $13,000 annually.[5]  After working there for several

years, Ms. Betancourt-Jones approached Ms. Patak about purchasing the store assets.[6]  Mr. Jones

was privy to the discussions with Ms. Patak, but as a full-time public-school administrator, he

admits that most of the direct negotiations were handled by his wife.[7]

---

[2]      Unless expressly stated otherwise, all references to "Bankruptcy Code" or "Code" or to specific sections
are to the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Abuse Prevention and consumer
Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, 11 U.S.C. § 101, *et seq*.  All
references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.

[3]      Transcript of September 23, 2019 Trial ("Vol. I Trans.") at 8; see *Parties' Stipulations*, Dkt. No. 123 (the
"Stipulation") ¶ 1.

[4]      *Stipulation* ¶ 1; Vol. I Trans. at 8.

[5]      Vol. I Trans. at 39:2-16; Ex. U, at 0537.

[6]      Transcript of September 24, 2019 Trial ("Vol. II Trans.") at 9:6-8; Vol. I Trans. at 120:22-121:15, 122:15-21.

[7]      Vol. I Trans. at 122:15-21.

During the negotiation phase, Ms. Patak, Ms. Betancourt-Jones, and three other individuals inventoried and packaged Shadyside Mining Company's inventory, which ultimately formed the basis for the asset listing incorporated into the APA.[8]  At trial, Ms. Betancourt-Jones insisted at least 20% of the beads were damaged due to improper packaging on the day they were inventoried.[9]  She also admitted that she knew the packaging process was inadequate while conducting the inventory, but there is no indication she alerted Ms. Patak or anyone else of her concerns at that time.[10]

To facilitate the asset purchase, the Joneses[11] created Grace Gems, a limited liability company of which they were the principal owners and only members.[12]  Mr. Jones retained a 49% interest in Grace Gems while Ms. Betancourt-Jones held the remaining 51%.[13]  In February 2014, Ms. Betancourt-Jones, Mr. Jones, and Grace Gems entered into the APA with Ms. Patak to acquire substantially all of Shadyside Mining Company's jewelry-assets for $215,000.[14]  Mr. Jones signed the agreement both in his individual capacity and as "President" of Grace Gems.[15]  The assets conveyed in the sale were identified on Schedule 1.1. of the APA,[16]

---

[8]   Vol. II Trans. at 15:19-16:5.

[9]   Id. at 25:24-26:21.

[10]   Id.

[11]   The reference to Mr. Jones and Ms. Betancourt-Jones together as the "Joneses" is merely for efficiency and clarity, and no disrespect is intended to Ms. Betancourt-Jones through this usage.

[12]   Ex. C; *Stipulation* ¶ 3.

[13]   *Schedule A/B*, Case No. 17-22147-GLT, Dkt. No. 27; *Schedule B - Personal Property*, Case No. 15-24220-GLT, Dkt. No. 11.

[14]   Vol. I Trans. at 11:3-10; Ex. A, 0014.

[15]   *Stipulation* ¶ 3; Ex. A, 0014.

[16]   Ex. A, 0015.

and consisted primarily of thousands of strands of semi-precious beads.[17]  The APA dictated that

the buyers pay an initial down-payment of $30,000, make three monthly installment payments of

$1,000 each on the first of March, April, and May 2014, and then complete the purchase with a

final balloon payment of $182,000 on May 31, 2014.[18]  Until the purchase price was satisfied,

the APA required the buyers to keep "detailed records of all the Assets purchased including a

detailed description of each item purchased, the cost of each item and the quantity purchased"

and to insure the assets against theft and other losses.[19]  After the APA was signed, Grace Gems

swiftly opened for business, operating from the same storefront Shadyside Mining Company had

used, and selling the acquired assets as well as other inventory.[20]

  Once Grace Gems was in business, it appears the Joneses did not comply with the

APA covenants because any records they kept were not sufficiently detailed.  All sales were

recorded on small, hand-written slips of paper,[21] and although the business used a computerized

point of sale system to process credit card payments, it did not maintain inventory records.[22]  The

sales slips were then provided to their accountant, Robert Latch.[23]  Mr. Latch tallied up sales tax

amounts for the first three months of the store's operation from the handwritten paper slips, but

refused to work with the slips going forward.[24]  Thereafter, Mr. Jones compiled monthly

---

[17] Ex. A, 0015.

[18] Vol. I Trans. at 15-16; Ex. A, 0006.

[19] Ex. A, 0004 at §§ 1.4(a), (f).

[20] Vol. I Trans. at 153:22-23; *Stipulation* ¶ 2. At all relevant times, Grace Gems was doing business under the trade name "Heart of the Earth." Vol. I Trans. at 17-18.

[21] *Stipulation* ¶ 10.

[22] Vol. I Trans. at 62:8-14, 127:20-25.

[23] Id. at 128:6-14.

[24] Id. at 101:1-8; Ex. HH.

summaries of the paper slips and provided the summaries to Mr. Latch.[25]  Mr. Latch would then prepare sales tax returns for the business using those summaries.[26]  Mr. Latch also prepared Mr. Jones' federal income tax returns for tax years 2014, 2015, and 2016.[27]  These returns reported business losses between $67,267 and $96,188 per year.[28]

Mr. Jones made the initial down-payment of $30,000 and four installment payments of $1,000 toward his obligations under the APA, but informed Ms. Patak he would be unable to make the balloon payment on time.[29]  Nevertheless, Mr. Jones stated he would be able to do so if granted an extension.[30]  He told Ms. Patak that he was transferring retirement funds from Michigan to Pennsylvania, and once that was completed, he could provide $125,000 by June 30, 2014 and the remainder by January 2015.[31]

Based on those discussions, the parties entered into an Addendum to the APA (the "Addendum") which extended the payment term.[32]  In lieu of a $181,000 balloon payment due on May 31, 2014,[33] Ms. Patak agreed to accept $100,000 by June 30, 2014, with the residual balance paid through eight monthly installments of $1,000 beginning in July 2014, and any remaining balance (estimated to be $73,000) due on January 31, 2015.[34]

---

[25]    Vol. I Trans. at 128:6-10; Ex. HH.

[26]    Vol. I Trans. at 128: 6-10.

[27]    Id. at 99:13-21.

[28]    Id. at 131:12-13, 135:23-24.

[29]    Id. at 16:16-17.

[30]    Id. at 16:16-17; 159-60.

[31]    See id. at 16:16-21, 18:16-20, 161:13-17; see also Ex. I, 0128-32.

[32]    Ex. B, 0040.

[33]    Id.

[34]    Vol. I Trans at 16:17-23; Ex. B, 0040-0041.

Even with the extension, Mr. Jones failed to make payments as required, triggering a new default. After the June 30 deadline passed without payment, he remained in contact with Ms. Patak, promising her $100,000 once the funds became available from his financial planner.[35] On July 21, the parties agreed to a meeting where Mr. Jones planned to deliver a $100,000 cashier's check to Ms. Patak, but instead he arrived without any funds.[36] The parties disagree as to what was said next. According to Ms. Patak, Mr. Jones told her that his money transfers had been completed, but he was not going to pay because "his wife did not want him to use his retirement funds to pay [Ms. Patak]."[37] Mr. Jones disputes this, suggesting it was his financial planner who cautioned him against using the money.[38]  In any event, Mr. Jones admits that as of July 21, he had access to sufficient funds in his retirement account to make the $100,000 payment, if not more.[39]

Mr. Jones claims he subsequently attempted to provide Ms. Patak with partial payments totaling $45,000, but she refused them because she did not want the payments construed as a satisfaction of the outstanding obligations.[40]  The first attempted "payment" involved an unsolicited text message sent by Mr. Jones to Ms. Patak on July 25, 2014, indicating his plan to unilaterally deposit $35,000 into her bank account.[41]  Upon learning this, Ms. Patak

---

[35]     Vol. I Trans. at 20; Ex. H 0060

[36]     Vol. I Trans. at 21-22, 163:15-22; Ex. H 0062

[37]     Vol. I Trans. at 22:5-9.

[38]     Id. at 165:2-6.

[39]     Id. at 164:11-14.

[40]     Id. at 45-46, 51, 140-41; see also Exs. 1, 10.

[41]     Ex. 10; Vol. I Trans. at 140-42.

instructed him not to make the deposit because she did not agree with his terms.[42]  Over one year

later, Ms. Betancourt-Jones attempted to deliver a $10,000 bank check to Ms. Patak, but she

returned the check to the Joneses.[43]  Mr. Jones claims he attempted to make the partial-payments

because Ms. Patak had actually requested them.[44]  Regardless, the Addendum was not satisfied,

and Ms. Patak initiated a state court action for breach of contract against Mr. Jones, Ms.

Betancourt-Jones, and Grace Gems.[45]

Grace Gems and Ms. Betancourt-Jones each filed for bankruptcy protection in

2015, and their cases have since been closed.[46]  Ms. Betancourt-Jones sought relief under chapter

7 and received a discharge on May 27, 2016.[47]  Grace Gems commenced its case under chapter

11, and at the time of its filing in November 2015, it reportedly possessed assets with a value

exceeding $295,000, including jewelry and bead inventory in excess of $268,000.[48]  A year later,

Grace Gems proposed to sell all of its assets to Ms. Betancourt-Jones for a purchase price of

$40,000.[49]  While Grace Gems was operating as a debtor-in-possession in chapter 11, Mr. Jones

---

[42]    Ex. 10.

[43]    Vol. I Trans. at 45, 51, 140-41; Ex. 1.

[44]    Vol. I Trans at 141:22-142:3.

[45]    *Stipulation* ¶ 5; Vol. I Trans. at 24:7-9; Ex. AA.

[46]    Vol. I Trans. at 24:10-12; *Stipulation* ¶ 6; see Case Nos. 15-24218-GLT and 15-24220-GLT.

[47]    *Chapter 7 Voluntary Petition*, Case No. 15-24220-GLT, Dkt. No. 1; *Order Discharging Debtor*, Case No. 15-24220-GLT, Dkt. No. 23.  Although Ms. Patak entered an appearance in the case, she did not oppose the discharge.

[48]    *Chapter 11 Voluntary Petition*, Case No. 15-24218-GLT, Dkt. No. 1; *Schedule B – Personal Property*, Case No. 15-24218-GLT, Dkt. No. 13; *Stipulation* ¶ 13.

[49]    *Motion to Sell Property Free and Clear of Liens under Section 363(f)*, Case No. 15-24218-GLT, Dkt. No. 109.

prepared and verified all of the store's monthly operating reports, detailing the store's monthly receipts and disbursements.[50]

After 16 months in bankruptcy, Grace Gems consented to conversion of its case to chapter 7.[51] The store ceased operations on March 31, 2017.[52] Following conversion, Mr. Jones admitted that he and Ms. Betancourt-Jones retained estate property that should have been turned over to the chapter 7 trustee, including several bottles of essential oils having a value of no more than $200.[53] The Joneses also transferred money into and out of Grace Gems' accounts while its case was pending in both chapter 11 and chapter 7.[54] Mr. Jones suggested the infusions of personal funds were to keep the business afloat and always exceeded the draws, which were never greater than $2,000 per year upon the advice of Mr. Latch. The Joneses allegedly made the draws because neither of them received an employee salary.[55]

A few days before Ms. Betancourt-Jones received her chapter 7 discharge, and less than a year before he filed his own bankruptcy case, Mr. Jones transferred the title to his home.[56] The property, located in Indiana Township, was originally held solely in his name, but Mr. Jones subsequently transferred it to himself and Ms. Betancourt-Jones as tenants by the

---

[50]    Vol. II Trans. at 30:6-10; *Stipulation*, ¶¶ 7-8;

[51]    *Motion to Convert Case from Chapter 11 to Chapter 7*, Case No. 15-24218-GLT, Dkt. No. 166; *Order Granting Motion to Convert Case from Chapter 11 to Chapter 7*, Case No. 15-24218-GLT, Dkt. No. 177; *Stipulation* ¶ 13.

[52]    Vol. II Trans. at 29.

[53]    Vol. I Trans. at 148:15-24; Vol. II Trans. at 34:2.

[54]    Vol. I Trans. at 149:17-19; 150:14-24; *Stipulation* ¶ 9.

[55]    Vol. I Trans. at 149:17-23; 150:7-14; 151:5-8.

[56]    Ex. V; Ex. X; Vol. I Trans. at 152:17-19.

entireties by a deed executed on May 18, 2016 and recorded on May 25, 2016.[57]  Mr. Jones

claims the transfer was required as part of a refinance of his home mortgage.[58]

Mr. Jones filed his own petition for chapter 7 relief on May 22, 2017.[59]  The home

was the largest asset listed on his schedules, having a value of $330,000 with an estimated

$289,545 in secured claims.[60]  Mr. Jones initially claimed an exemption for 100% of the

property's value under Pennsylvania entireties law, but he later amended *Schedule C* to claim a

limited exemption of $19,651 under section 522(d)(1).[61]

Ms. Patak timely filed a complaint objecting to discharge.  In her *Amended

Complaint*,[62] Ms. Patak claims Mr. Jones should be denied a discharge under section 727

because he: (1) transferred real property within one year of his bankruptcy petition with the

intent to hinder, delay, or defraud his creditors (section 727(a)(2)(A)); (2) transferred property of

the Grace Gems bankruptcy estate with the intent to hinder, delay, or defraud creditors (section

727(a)(2)(B)); (3) failed to keep and preserve adequate business records for Grace Gems (section

727(a)(3)); and (4) failed to keep track of the assets of Grace Gems (section 727(a)(5)).[63]  Ms.

Patak maintains that actions taken in the Grace Gems bankruptcy can be imputed to Mr. Jones

under section 727(a)(7) because he was an insider and such acts occurred either during the

---

[57]    Ex. V; Ex. X; Vol. I Trans. at 152:17-19.

[58]    Vol. I Trans. at 152-53.

[59]    *Chapter 7 Voluntary Petition*, Case No. 17-22147-GLT, Dkt. No. 1.

[60]    *Schedule A/B*, Case No. 17-22147-GLT, Dkt. No. 27.

[61]    *Schedule C*, Case No. 17-22147-GLT, Dkt. No. 13; *Schedule C (as amended)*, Case No. 17-22147-GLT, Dkt. No. 27.

[62]    *Second Amended Complaint (1) Objecting to General Discharge and (2) for Determination of Dischargeability of Debt*, Dkt. No. 18 (the "Amended Complaint").

[63]    Id.  The *Amended Complaint* contained an additional count under section 523 (Count 6) that was dismissed by the Court by order entered at Dkt. No. 24.

bankruptcy case or in the one year prior to the filing.  As an additional count, Ms. Patak asserts

her claim should be excepted from discharge under section 523(a)(2)(A) because Mr. Jones used

false pretenses and false representations to deceive her into signing the APA and Addendum and

handing over the jewelry store assets.

The Court conducted a two-day evidentiary hearing where Ms. Patak, Mr. James

S. Fellin, Mr. Jones, and Ms. Betancourt-Jones testified.  Mr. Fellin, an expert in forensic

accounting, was called by Ms. Patak to address the status of Mr. Jones' financial

documentation.[64]  Mr. Fellin testified that the records Mr. Jones kept of Grace Gems' sales and

purchases were basically incomprehensible, satisfying neither state nor federal standards, nor the

requirements of the APA.[65]  Mr. Fellin composed a report that attempted to piece together Mr.

Jones' books and concluded that the records were "absurdly inadequate."[66]

Mr. Fellin also attempted to reconcile the business inventory.  The APA reflects

that Mr. Jones purchased 7,981 strands of beads from Ms. Patak in 2014, but Grace Gems'

schedules reported that fewer than 2,800 strands remained as of the bankruptcy petition date.[67]

When Grace Gems attempted to sell its assets to Ms. Betancourt-Jones a year later, it identified

approximately 1,271 strands available for sale.[68]  Mr. Fellin testified that an inventory reduction

of more than 5,000 strands (from the date of the APA to the petition date) should have generated

minimum sales of at least $389,000,[69] yet Mr. Jones only reported sales of $100,000 on his tax

---

[64]     Vol. I Trans. at 54:9-17.

[65]     Id. at 61-65.

[66]     Ex. U at 0517.

[67]     Vol. I Trans. at 73:15-20.

[68]     *Motion to Sell Property Free and Clear of Liens under Section 363(f)*, Case 15-24218-GLT, Dkt. No. 109.

[69]     Vol. I Trans. at 84:13-14.

returns.[70]  In the absence of any other explanation, Mr. Fellin concluded that these fundamental

inconsistencies suggest either a 300% underreporting of taxable income to the Internal Revenue

Service or an equivalent underreporting of assets to this Court.[71]

The Joneses offered two explanations for the reduced inventory levels.  First, they

claim the business suffered from multiple break-ins and employee thefts, but admit they are

unable to ascertain if anything was actually stolen.[72]  Mr. Jones also claims he received multiple

phone calls from the police after they had been summoned by a tripped security alarm,[73] but

neither Mr. Jones nor Ms. Betancourt-Jones filed a police report or an insurance claim for any of

the alleged losses.[74]  And while there was a security camera on the premises, it was broken and

never repaired, leaving the store without the means to record evidence of any alleged break-in or

employee theft.[75]

Ms. Betancourt-Jones also suggested the asset schedule in the APA was

overstated from the outset, and claims the inventory listing should have been edited before it was

incorporated into the agreement.[76]  As noted above, Ms. Betancourt-Jones alleges that up to 20%

of the inventory was damaged when it was packaged during the inventory process.[77]  She also

---

[70]     Vol. I Trans. at 84:21-22.

[71]     Id. at 84:23.

[72]     Id. at 143-147; Vol. II Trans. at 29:2-4.

[73]     Vol. I Trans. at 143:19; Vol. II Trans. at 28:10.

[74]     Vol. I Trans. at 181:2-14.

[75]     Vol. II Trans. at 37:9-13.   Ms. Betancourt-Jones alleges the camera was tampered with before the
bankruptcy was filed.

[76]     Id. at 11:25-12:3.

[77]     Id. at 25:24-26:21.

contends the asset listing is vague because the quantity of several line items is missing.[78]
Despite this, Ms. Betancourt-Jones does not dispute the number of beads listed in the APA.[79]

During the hearing, the parties also offered opposing reasons why Mr. Jones did not make payments as required under the APA and Addendum.  Mr. Jones claims he intended to pay Ms. Patak from the income generated by the store but was unable to do so with its reported sales volume.[80]  Mr. Fellin challenged this contention as an "absurdity."[81]  He suggested that even "the most unsophisticated business person" would conclude that, based on Shadyside Mining Company's past operating results, Grace Gems would be incapable of generating adequate profits to fund the payments owed to Ms. Patak.[82]  To the extent another source was required, Mr. Fellin observed that Mr. Jones reported more than sufficient income on his 2014 income tax return to satisfy his debts, including nearly $350,000 in IRA and pension distributions. [83]

After the trial concluded, the parties submitted supplemental briefs.  With the evidentiary record closed, this matter is now ripe for adjudication.

## II.   <u>JURISDICTION</u>

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United

---

[78]      Vol. II Trans. at 12:5-15:5.

[79]      <u>Id.</u> at 12:1-15:5.

[80]      Vol. I Trans. at 143:2-7, 164:4-8.

[81]      <u>Id.</u> at 66-67.

[82]      <u>Id.</u>

[83]      <u>Id.</u> at 70:13-24.

States District Court for the Western District of Pennsylvania on October 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## III.   DISCUSSION

The purpose of the bankruptcy process is to afford the honest, but unfortunate, debtor a "fresh start."[84]   In a chapter 7 setting, it is presumed that a debtor will be granted discharge at the conclusion of their case.   An order for discharge "releases a debtor from personal liability with respect to any discharged debt by voiding any past or future judgments on the debt and by operating as an injunction to prohibit creditors from attempting to collect or to recover the debt."[85]   In fact, "[denial of or exception to] discharge should only occur in extreme circumstances and objections to discharge should be liberally construed in favor of the debtor."[86]   A  discharge is a privilege, not a right, and a creditor may object to a debtor's discharge on a variety of grounds.[87]   The objecting creditor must establish why the debtor should not be granted discharge or why their debt should be excepted from discharge by a preponderance of the evidence.[88]

### A.   Section 727(a)(2)(A) – Intent to Hinder by Transferring Property of the Debtor

A chapter 7 debtor's discharge may be denied under section 727(a)(2)(A) if they, with the intent to hinder, delay, or defraud a creditor " … transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or

---

[84]     Grogan v. Garner, 498 U.S. 279, 286-87 (1991).

[85]     Tenn. Student Assistance Corp. v. Hood, 541 U.S. 440, 447 (2004).

[86]     In re Lybrook, 544 B.R. 537, 543 (Bankr. W.D. Pa. 2015).

[87]     See 11 U.S.C. §§ 727 and 523.

[88]     Grogan, 498 U.S. at 291.

concealed … property of the *debtor, within one year before the date of the filing of the petition.*"[89]  To prevail on this claim, the objector must show there was a disposition of property, made with a subjective intent to hinder, delay, or defraud a creditor or the trustee, and that both the intent and the disposition happened within one year before the petition was filed.[90] As there is no concept of a "constructive" fraudulent transfer under section 727(a)(2)(A), actual intent to hinder, delay, or defraud must be shown.[91]  Thus, a denial of discharge under this section requires both an act and an improper motive.[92]  In the absence of direct proof of subjective intent, the court may resort to circumstantial evidence.[93]  To inform its analysis, the court may consult the following "badges of fraud" which may establish subjective intent whenever:

> (a)    a close relationship exists between the debtor and transferee;
>
> (b)    the debtor retained possession or control of the property after the transfer;
>
> (c)    before the transfer occurred, the debtor had been sued or was threatened with suit;
>
> (d)    the debtor was insolvent or in poor financial condition at the time of the transfer;
>
> (e)    the transfer was concealed or not disclosed;
>
> (f)    all or substantially all of the debtor's property was transferred; and

---

[89]      See 11 U.S.C. § 727(a)(2)(A) (internal numbering omitted)(emphasis added).

[90]      Melarango v. Ciotti, (In re Ciotti), 448 B.R. 694, 701 (Bankr. W.D. Pa. 2011).

[91]      Id.

[92]      In re Lybrook, 544 B.R. at 548 (citing Melarango, 448 B.R. at 701).

[93]      Id. at 550 (citing In re Roach, 2014 WL 1884345 *5 (Bankr.W.D.Pa. May 12, 2014)).

> (g)     the debtor received inadequate consideration for the transfer. [94]

Transfers between relatives, in particular, are heavily scrutinized and many courts recognize a presumption of fraudulent intent simply upon a showing that a transfer is made gratuitously or to a relative.[95]   Consequently, intent can be established upon a single badge of fraud if the circumstances are particularly strong.[96]

  After considering the record, Ms. Patak has met her burden under section 727(a)(2)(A).  It is undisputed that Mr. Jones transferred his home, for which he was the sole owner, to himself and his wife as tenants by the entirety within one year of the petition date.[97] Ms. Patak also made an adequate showing of subjective intent.  Not only did Mr. Jones transfer an interest in the property to his wife, he did so for the nominal consideration of $1.  According to his bankruptcy schedules, the home was his most valuable asset, and he continued to reside on the property following the transfer.  The transaction also effectively placed the property out of the reach of Mr. Jones' creditors during a time when he was a defendant in a pending lawsuit

---

[94]     See BFP v. Resolution Tr. Corp., 511 U.S. 531, 541 (1994) (explaining that bankruptcy courts can rely upon certain "badges of fraud" to find an intent to defraud, those badges are "proof by a creditor of certain objective facts … (for example, a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration) [that] would raise a rebuttable presumption of actual fraudulent intent …"); see also In re Pers. & Bus. Ins. Agency, 334 F.3d 239, 243 (3d Cir. 2003); In re Glunk, 342 B.R. 717, 734 n. 30 (Bankr. E.D. Pa. 2006); In re Lybrook, 544 B.R. at 550.

[95]     In re Chastant, 873 F.2d 89, 91 (5th Cir. 1989) ("a presumption of actual fraudulent intent necessary to bar a discharge arises when property is either transferred gratuitously or is transferred to relatives." (citing In re Butler, 38 B.R. 884, 888 (Bankr. D. Kan.1984))); In re Lang, 246 B.R. 463, 470 (Bankr. D. Mass. 2000) ("[m]ost courts agree that when a debtor transfers property gratuitously or to relatives in the shadow of a bankruptcy filing, a presumption of fraudulent intent arises." (citing In re Kablaoui, 196 B.R. 705, 710 (Bankr. S.D.N.Y. 1996)); In re Sicari, 187 B.R. 861, 872 (Bankr. S.D.N.Y. 1994); Abbott Bank–Hemingford v. Armstrong (In re Armstrong), 931 F.2d 1233, 1239 (8th Cir.1991); Francis v. Riso (In re Riso), 74 B.R. 750, 757 (Bankr. D. N.H. 1987))).

[96]     In re Cohen, 142 B.R. 720, 728 (Bankr. E.D. Pa. 1992).

[97]     See Exs. V, X; Vol. I Trans. at 184.

brought by Ms. Patak.[98]  Prior to the transfer, Ms. Patak could have executed against the property to enforce any judgment she might obtain against Mr. Jones.  But after the transfer, the entireties property became immune from execution by a creditor holding a judgment against only one spouse.[99]  The timing of the transaction is also suspect because it did not occur until after Ms. Betancourt-Jones was assured of receiving a chapter 7 discharge, thereby ensuring that no creditor could have a joint claim against both husband and wife.  Mr. Jones also made no effort to disclose the transaction on his bankruptcy schedules.[100]  Taken together, all of these factors compellingly show that Mr. Jones conveyed an interest in the property to his wife for the subjective intent of thwarting creditor collection efforts within one year of his bankruptcy case.

Once Ms. Patak established a *prima facie* case under section 727(a)(2)(A), the burden shifts to Mr. Jones to show an absence of fraudulent intent by providing a satisfactory explanation for his conduct.[101]  In response, Mr. Jones claims he refinanced his home mortgage in May 2016 and the transfer was a condition of the refinance.[102]  And because Mr. Jones took a partial federal exemption in the residence (in lieu of a more generous state exemption for entireties property), he claims the exposed equity leads to the same result as if the transfer had

---

[98]     *Stipulation* ¶ 5; Ex. AA.

[99]     ISN Bank v. Rajaratnam, 83 A.3d 170, 174 (Pa. Super. Ct. 2013).

[100]    See *Statement of Financial Affairs for Individuals Filing Bankruptcy*, Case No. 17-22147-GLT, Dkt. No. 13.

[101]    See In re Duncan, 562 F.3d 688, 698 (5th Cir. 2009); In re Harman, No. 11-67522-MHM, 2014 WL 5359708, at *3 (Bankr. N.D. Ga. Sept. 11, 2014) ("Vague explanations without corroborating documents are unsatisfactory." (citing Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 619 (11th Cir.1984)); In re Korman, No. 09-13311-TJC, 2012 WL 4467628, at *17 (Bankr. D. Md. Sept. 26, 2012), aff'd sub nom. Korman v. EagleBank, No. PWG-12-3449, 2013 WL 3816987 (D. Md. July 22, 2013), aff'd, 565 F. App'x 164 (4th Cir. 2014).

[102]    Vol. I Trans. at 152-53.

not occurred, thereby blunting any assertion that the transfer hindered or delayed creditor collection efforts.[103]

> While plausible on its face, Mr. Jones' testimony about his efforts to refinance the property is remarkable for its stunning lack of detail.  It should have been easy for Mr. Jones to disclose his motivation for refinancing the property and why he chose to proceed at that time.  Perhaps he found a substantially lower interest rate or needed to cash out some of the equity in the home.  But none of that appears in the record.  It is also unclear why the transaction had to take place at that precise moment in time.  Ms. Betancourt-Jones is apparently not an obligor on the refinanced note and the transfer occurred before she received a discharge, but after the deadline to object to discharge had passed.[104]  Once again, the record contains none of the depth necessary to understand the nature of the transaction.  Instead, the Court is left with two isolated (albeit unrefuted) statements indicating that the transfer "was a condition of the refinance[,]" and a self-serving denial from Mr. Jones disclaiming any intent to transfer the property for the purpose of avoiding payment to Ms. Patak.[105]

> Faced with compelling evidence of subjective intent, it was incumbent upon Mr. Jones to provide a rational justification for the transfer beyond mere cursory statements.  In essence, he provided an excuse, but not an explanation for the transfer.  Absent such proof, the

---

[103]   Vol. I Trans. at 152.

[104]   The Court takes judicial notice of the loan documents attached to a *Motion for Relief from the Automatic Stay* filed by the purported holder of the refinanced mortgage, Freedom Mortgage Corporation.  See Case No. 17-22147-GLT, Dkt. No. 116.  The motion contains a note dated May 18, 2016 executed by Ronald S. Jones, as well as a mortgage executed by both Mr. Jones and Grace M. Moffett-Betancourt, his wife.  Neither Mr. Jones nor any other party has contested the validity of the documents in that case.  See also Case No. 15-24220-GLT, Dkt. No. 13, setting April 1, 2016 as the last day to object to a discharge in Ms. Betancourt-Jones' bankruptcy case.  As noted before, her discharge was issued on May 27, 2016.  See fn. 47 *infra*.

[105]   Vol. I Trans. at 152:19, 153:10-15.

Court cannot discredit the idea that the act of refinancing was itself a tactical decision intended to provide cover for an otherwise fraudulent transfer. The Court also cannot ignore that Mr. Jones strategically waited one year before filing his bankruptcy petition in a possible effort to limit subsequent challenges to the transaction.[106] And given its concerns with the credibility of Mr. Jones' testimony (as noted elsewhere in this *Memorandum Opinion*), the Court cannot help but conclude that these omissions were intentional. Without a suitable explanation for the refinance, the Court finds that Mr. Jones has not rebutted the presumption of fraudulent intent.

Based on the foregoing, the Court concludes that Ms. Patak met her evidentiary burden of showing that Mr. Jones transferred the property with an actual intent to hinder or delay creditors by a preponderance of the evidence. Accordingly, judgment will be rendered in favor of Ms. Patak as to Count 1.

### B.    Section 727(a)(2)(B) – Intent to Hinder by Transferring Estate Property

If a chapter 7 debtor "… transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed … property of the *estate, after the date of the filing of the petition*" their discharge may be denied.[107] Similarly, denial of discharge under this section also requires both an act and an improper motive.[108] A debtor can be denied a discharge if, as an insider to another debtor's bankruptcy case, they

---

[106]    When Ms. Patak first challenged his discharge, Mr. Jones was quick to point out that section 727(a)(2)(A) did not apply because more than one year – 369 days to be exact – had passed between the time the deed was executed and the bankruptcy case was filed. This proved to be inaccurate. Under Pennsylvania law, a transfer of real estate is deemed effective as to a subsequent bona fide purchaser when the deed is recorded. See In re MacQuown, 717 F.2d 859, 863 (3d Cir. 1983). Because the deed here was recorded on May 25, 2016, Mr. Jones' calculations were off by at least three days and section 727(a)(2)(A) applies because the transfer effectively occurred within one year of the petition date.

[107]    See 11 U.S.C. § 727(a)(2)(B) (internal numbering omitted)(emphasis added).

[108]    In re Ciotti, 448 B.R. at 701; In re Finney, 333 B.R. 242, 247 (Bankr. W.D. Pa. 2005).

committed one of the enumerated acts in this section.[109]  As an owner and "President" of Grace Gems, it is doubtless Mr. Jones is an insider.[110]

Even though Ms. Patak has shown that estate property was removed during the pendency of the Grace Gems bankruptcy case, she has not proven improper motive.  It is undisputed that Mr. Jones and Ms. Betancourt-Jones kept several bottles of essential oils of *de minimus* value that should have been handed over to the chapter 7 trustee and that Mr. Jones made draws from Grace Gems' accounts.  But Ms. Patak provided little evidence that the retention of estate property and the draws from the store's accounts, beyond the fact that they happened, were done with the intent to hinder or delay.  Mr. Jones testified that retaining the bottles of oil was inadvertent, not malicious.  Additionally, the unrebutted evidence was that the cash draws were in lieu of any salary and were always kept to less than $2,000 per year upon the advice of their accountant.[111]  Ultimately, Ms. Patak has not carried her burden to show intent to hinder or delay by a preponderance of the evidence.  Accordingly, Mr. Jones is entitled to judgment on this Count.

### C.    Section 727(a)(3) – Inadequate Transactional Records

In the ordinary course, a debtor must maintain adequate records of their finances so that the court and creditors can have a complete and accurate accounting of the debtor's financial affairs.[112]  Under section 727(a)(3), a chapter 7 debtor will be denied a discharge if they "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information … from which the debtor's financial condition or business transactions might be

---

[109]     See 11 U.S.C. § 727(a)(7).

[110]     See 11 U.S.C. § 101(31).

[111]     Vol. I Trans. at 153.

[112]     Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992).

ascertained …" unless they were justified in doing so.[113]   A party objecting to a debtor's

discharge based on their lack of adequate record-keeping has the initial burden to show that: "(1)

the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it

impossible to ascertain the debtor's financial condition and material business transactions."[114]

The debtor may then respond to the creditor's accusation by producing records that were

adequately maintained or by proving that the debtor's record-keeping practices, even though

inadequate, were justified.[115]

      When attempting to prove adequacy, the debtor cannot produce records that are

"chaotic or incomplete,"[116] or "in such a condition that a creditor is required to speculate as to

the financial history or condition of the debtor,"[117] or "compelled to organize and reconstruct the

debtor's business affairs."[118]   The more complex the business and the more sophisticated the

record-keeper, the more thorough and detailed the records should be.[119]   At base, a debtor needs

to maintain records sufficient enough that a creditor can get a picture of the debtor's financial

situation without having to undertake an independent investigation.[120]

      While it is Mr. Jones' discharge, and not Grace Gems', at issue, it is common

practice for courts to evaluate the sufficiency of the books and records of a debtor-owned and

---

[113]    See 11 U.S.C. § 727(a)(3) (internal numbering omitted).

[114]    Meridian Bank, 958 F.2d at 1232.

[115]    Id. at 1233.

[116]    In re Buzzelli, 246 B.R. 75, 96 (Bankr. W.D. Pa. 2000); see In re Decker, 595 F.2d 185, 187 (3d Cir. 1979).

[117]    In re Buzzelli, 246 B.R. at 96.

[118]    Id., see also In re Goldstein, 123 B.R. 514, 525 (Bankr. E.D. Pa. 1991); In re Dias, 95 B.R. 419, 422-23 (Bankr. N.D. Tex. 1988).

[119]    In re Burrik, 459 B.R. at 895 (quoting In re Pulos, 168 B.R. 682, 692 (Bankr. D. Minn. 1994)).

[120]    In re Buzzelli, 246 B.R. at 96-97; see also 11 U.S.C. § 727(a)(7).

controlled business in order to resolve discharge objections under this section.[121]  Mr. Jones held

himself out as the "President" of Grace Gems when he signed the APA, owned 49% of the store,

and provided the funds to buy the assets from Ms. Patak.[122]  Mr. Jones also testified that he

received phone calls from the police when the security alarms were supposedly triggered and

was responsible for filing the store's monthly operating reports while its chapter 11 case was

pending, all of which indicate he had a stake in, and at least moderate control of, the business.

Therefore, the Court will consider Grace Gems' financial records, or lack thereof, as indicative

of Mr. Jones' records.

       The Court concludes that Ms. Patak proved by a preponderance of the evidence

that Mr. Jones failed to keep or preserve sufficient recorded financial information from which his

financial situation could be ascertained.  Ms. Patak pointed to the haphazard handwritten sales

slips and the lack of an overarching set of books recording the business' sales and receipts to

show that Mr. Jones failed to maintain or preserve adequate records.  Further, the handwritten

slips were so inadequate that Mr. Jones' own accountant refused to deal with them and insisted

that he be given monthly summaries of the store's sales and sales tax liabilities instead.[123]  Mr.

Latch also prompted the Joneses to file their first quarter sales tax return in the first place, which

is further indication the finances of the business were not adequately maintained.  Even Mr.

Fellin, an expert in forensic accounting employed to untangle these records, was unable to

recreate Mr. Jones' financials and material business transactions.[124]  The records were so

incomprehensible the Joneses had to tacitly concede they were unreliable.  Assuming the alleged

---

[121]     In re Belonzi, 476 B.R. 899, 904 (Bankr. W.D. Pa. 2012).

[122]     *Schedule A/B*, Case No. 17-22147-GLT, Dkt. No. 27.

[123]     Vol. I Trans. at 128:6-12; Ex. HH.

[124]     Ex. U, 0521.

employee thefts and break-ins actually occurred, the Joneses admit they were unable to verify if anything had been truly stolen because they lacked the capacity – through accurate record keeping – to identify the missing items.

Mr. Jones tried to justify these inadequacies by positing that he is not a businessperson and was infrequently at the store, but this assertion is undercut by his known involvement. Mr. Jones was one of the principals of the endeavor and was involved with the negotiation of the Addendum, so it stands to reason he would have had knowledge of the store's operations. Mr. Jones also verified, under penalty of perjury, the accuracy of the monthly operating reports filed by Grace Gems during its chapter 11 bankruptcy, which included the store's receipts and disbursements.[125] Finally, Mr. Jones has been employed as an upper-level high-school administrator so it is reasonable to conclude that he could keep a simple, but thorough, log of sales and purchases. Maintaining a basic ledger of recorded sales and acquired inventory is rudimentary and does not require advanced business acumen. Grace Gems was also not the type of business to necessitate advanced bookkeeping because it did not have a large line of credit or a complicated business model.[126] Furthermore, Mr. Jones obligated himself to keep "detailed records of all the Assets purchased" under the APA.[127]

Mr. Jones contends that the tax returns constitute adequate financial data and Ms. Patak should have been able to apprise herself of his financial situation by looking at those

---

[125]    See *Monthly Financial Report(s)*, Case No. 15-2418-GLT, Dkt. Nos. 43-46, 62-64, 76-82, 116, 117, 133, 148-49, 174-75, 208.

[126]    See Meridian Bank, 958 F.2d at 1231.

[127]    Ex. A, 0004.

documents. [128]  Tax returns, in and of themselves, are insufficient financial records. [129]  While tax

returns can be informative for the inquiring creditor, they do not satisfy all the demands of a

traditional set of books. [130]  For example, the returns would not include a detailed itemization of

the store's business transactions or an explanation of any deductions Mr. Jones was claiming. [131]

More importantly, it has already been established that the tax returns in question are likely

unreliable due to the massive discrepancy between Grace Gems' bankruptcy schedules and

reported sales. [132]  Thus, Ms. Patak has proven that Mr. Jones did not maintain adequate financial

data and he has not provided a satisfactory explanation.  Therefore, Mr. Jones must be denied a

discharge pursuant to section 727(a)(3).

### D.    Section 727(a)(5) – Inexplicable Loss of Assets

Pursuant to section 727(a)(5), the Court shall grant a chapter 7 debtor a discharge

unless the debtor fails to satisfactorily explain any "loss of assets or deficiency of assets to meet

the debtor's liabilities …"  To prevail on a claim under this section, the objecting creditor must

introduce evidence: (1) identifying the assets; (2) showing that the debtor at one time had the

assets; and (3) showing that the assets are no longer available for the debtor's creditors. [133]  After

the objector introduces evidence of the prior existence and current dearth of assets, the burden

shifts to the debtor to "explain satisfactorily the losses or deficiencies." [134]  There is no set criteria

---

[128]    Vol. II Trans. at 103:1-105:15.

[129]    In re Buzzelli, 246 B.R. at 104.

[131]    Id.

[132]    Even if, for the sake of argument, tax returns could provide sufficient data for a creditor, these returns could
not.  Tax returns are only as good as the underlying financial information used to prepare them.

[133]    In re Potter, 88 B.R. 843, 849 (Bankr. N.D. Ill. 1988).

[134]    In re Burrik, 459 B.R. 881, 895 (Bankr. W.D. Pa. 2011) (quoting In re Potter, 88 B.R. at 849).

for what is satisfactory, and it is left to the court's discretion to decide.[135]   When determining

what would constitute a satisfactory explanation of the loss, various courts have considered

whether the debtor's explanation was vague and indefinite, whether the explanation was just an

uncorroborated list of transactions, or whether the explanation was a mere generality.[136]   The

Court is not required to rely on a debtor's bald assertions of questionable fact when determining

an objection to discharge.[137]

      Applying the foregoing, the Court finds that Ms. Patak has met her burden on this

Count.   She established that the roughly 8,000 strands of beads listed in the APA were handed

over to the Joneses once the APA was signed.[138]   Ms. Patak also showed that more than 5,000

strands disappeared by the time Grace Gems began its bankruptcy case without sufficient

corresponding sales proceeds and are no longer available to satisfy creditor claims.[139]   It is

deeply-concerning that Mr. Fellin's unrefuted testimony reflected a 300% inconsistency between

the number of beads listed on Grace Gems' bankruptcy schedules and the sales reported on the

store's tax returns.[140]

      Once Ms. Patak shouldered her burden of proof, it fell to Mr. Jones to

satisfactorily explain how or why the assets had been depleted.   He did not do so.   Even though

---

[135]    In re Burrik, 459 B.R. 881, 895 (Bankr. W.D. Pa. 2011) (quoting In re Potter, 88 B.R. at 849).

[136]    Id.

[137]    In re Buzzelli, 246 B.R. at 117; see In re Juzwiak, 89 F.3d 424, 429 (7th Cir. 1996); In re Shapiro, 59 B.R. 844, 848 (Bankr. E.D.N.Y. 1986); In re Pimpinella, 133 B.R. 694, 698 (E.D.N.Y. 1991).

[138]    Vol. II Trans. at 54:24-55:6.

[139]    Vol. I Trans. at 73:15-74:11.

[140]    Mr. Fellin's testimony did not delve into any postpetition changes in bead quantity that may have occurred. For example, the schedules showed as of the chapter 11 petition date Grace Gems held 2,700 strands; when Grace Gems attempted to sell its assets to Ms. Betancourt-Jones a year later, it identified about 1,271 strands; and post conversion the chapter 7 trustee moved to sell 1,898 strands of beads. *Exhibit A to Motion to Sell Property of the Estate Free and Clear of all Liens and Encumbrances*, Case No. 15-24218-GLT, Dkt. No. 267.

Mr. Jones testified that Grace Gems was victim to employee theft and several break ins, he could not point to anything concrete to substantiate that assertion. He did not have any police reports, never filed an insurance claim, and the store's security camera was inoperable. If Grace Gems actually sustained thefts on multiple occasions, it is incomprehensible to think Mr. Jones would take no action to mitigate the loss, fix the security camera, or otherwise protect the assets of the store. Worse yet, *Mr. Jones admitted he did not know if anything was actually stolen*. Put simply, the allegations of theft are not credible.

Ms. Betancourt-Jones also testified that some of the assets listed on the APA were either not properly identified or were damaged during the packaging process, leading to a reduction in the amount of saleable inventory and correspondingly, reduced sales. However, the bead-inventory was numerically designated in the APA and, aside from Ms. Betancourt-Jones' dubious testimony, there is no evidence that the number of beads conveyed was less than identified. Ms. Betancourt-Jones also participated in the packaging process when the damage allegedly occurred, and if she had a concern about the care with which the beads were handled or challenged the inventory quantity, she could have alerted Ms. Patak and sought a reduction in the purchase price or withdrawn from the negotiations. After all, the asset inventory was performed *before* the APA was executed. That Ms. Betancourt-Jones admitted she never expressed quality concerns to Ms. Patak until a default occurred only shows that her testimony is not credible.[141]

As a result of the conflicting documents and the inconsistent testimony, the Court concludes that Mr. Jones either grossly underreported the store's sales volume on his federal tax returns or he materially misrepresented the value of the assets held by Grace Gems to this Court.

---

[141]    The is not the first time the Court questioned Ms. Betancourt-Jones' credibility. During the Grace Gems bankruptcy, the Court found her in contempt after discounting an explanation she offered for her failure to comply with a Court order. See *Order*, Case No. 15-24218, Dkt. No. 280.

Neither possibility is a satisfactory explanation. Accordingly, Mr. Jones will be denied a discharge pursuant to section 727(a)(5).

### E.      Section 523(a)(2)(A) – Acting with False Pretenses or Making False Representations

Certain debts can be excepted from discharge if the "property, services, or an extension, renewal, or refinancing of credit …" in question was obtained by "false pretenses, a false representation, or actual fraud …"[142] In her *Amended Complaint*, Ms. Patak alleges Mr. Jones acted with false pretenses and made false representations, but she does not allege actual fraud, and so the Court will limit its analysis accordingly.[143] To prevail on a claim of false pretense or false representation, the claimant must show she sustained damage because the debtor knowingly made a false representation, on which the claimant justifiably relied, with the intent and purpose of deceiving the claimant.[144] Because there were two occasions for Mr. Jones to act with false pretenses or a false representation – the negotiation and signing of the APA *and* of the Addendum – the Court will evaluate each in turn.

As to the APA, the parties do not dispute that the Joneses received property upon signing the agreement or that Ms. Patak failed to receive all of the money owed her. Yet Ms. Patak has not carried her burden of proof with regard to the remaining elements. Specifically, she has not convincingly shown that Mr. Jones knowingly made a false statement or false representation, with the intent to deceive her, or that she relied on those falsities when signing the APA.

---

[142]     See 11 U.S.C. § 523(a)(2)(A) (internal numbering omitted).

[143]     *Amended Complaint* at ¶ 74.

[144]     Corso v. Walker (In re Walker), 449 B.R. 838, 847-48 (Bankr. W.D. Pa. 2011); see also Grogan, 498 U.S. 279 (1991); In re Ritter, 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009).

As previously indicated, the APA negotiations were primarily conducted between Ms. Patak and Ms. Betancourt-Jones, not Mr. Jones.[145]   While Mr. Jones signed the resulting APA, it was Ms. Patak and Ms. Betancourt-Jones who settled on a price for the assets and conducted the asset inventory.  In addition, it is undisputed that after the APA was signed, Mr. Jones made the initial $30,000 down payment and four subsequent installments of $1,000 each, providing strong evidence that Mr. Jones had the intent to follow through with the terms of the APA when he approached the negotiating table.   Ms. Patak suggests that Mr. Jones never intended to complete the terms of the APA, but his initial payment of material sums towards its completion and the absence of any other compelling evidence to the contrary leads the Court to conclude that she has not met her burden.

The outcome is much different when the Addendum is examined.  It is undisputed that Mr. Jones requested more time to comply with the APA.[146]   He told Ms. Patak that he intended to fund the payment from a retirement account, but required additional time to effectuate a transfer.[147]   Based on these representations, Ms. Patak accepted his proposal to pay $100,000 by June 30, 2014 with the remaining balance due by January 2015.[148]   The parties memorialized the agreement in the Addendum, which effectively extended the payment term by an additional eight months.   Mr. Jones ultimately failed to make a payment by June 30 as required by the Addendum, nor did he provide any funds in a subsequent meeting with Ms. Patak

---

[145]     Vol. I Trans. at 122:15-19.

[146]     Id. at 16:16-21; 159-60.

[147]     See id. at 16:16-21, 18:16-20, 161:13-17; see also Ex. I, 0128-32.

[148]     See id.

on July 21.[149]  Although Mr. Jones attempted to make modest partial payments over the ensuing

months, Ms. Patak has yet to receive the balance owed under the APA.

From these undisputed facts, the Court finds that Mr. Jones made a false

representation to Ms. Patak, which she justifiably relied upon to enter into the Addendum.

Because she did not receive payment at the end of the extension period, and the debt remains

unsatisfied, Ms. Patak has also shown that she sustained a loss due to the representation.

The sole remaining factor is whether Mr. Jones made the representation with an

intent to deceive.  Ms. Patak argues that Mr. Jones never intended to pay the purchase price, nor

was he ever willing to tap into his retirement income.  To support this, she claims Mr. Jones

repeatedly asked for more time to perform until one day, at a face-to-face meeting, he finally

admitted that Ms. Betancourt-Jones would not allow him to use the retirement funds to make the

payments.  Mr. Jones disputes saying this and suggests he always intended to pay the purchase

price from the business revenue.  But given the store's poor performance, he lacked the resources

to satisfy Ms. Patak and was instead advised to use the retirement funds to bolster operations.

As with the prior Counts, the Court does not find Mr. Jones' testimony credible

because it is not substantiated by the undisputed facts.  Mr. Jones could not have reasonably

believed that Grace Gems was capable of generating revenue sufficient to fund the necessary

payments under the Addendum.  Mr. Fellin testified that it was an "absurdity" for Mr. Jones to

assume he could pay the amount due solely from profits.  Referencing a schedule of Shadyside

Mining Company's revenues, gross profits, and net income from 2008-2011, Mr. Fellin observed

that the store generated net income of no more than $12,516 in a single year.  Although the

Joneses claim they were not provided with this information, Ms. Betancourt-Jones managed the

store for over two years prior to the acquisition and likely knew the store's earning potential

---

[149]    Vol. I Trans. at 20-22, 163:15-22; Ex. H 0060-62.

better than most.  And even if her sales experience could not be imputed to Mr. Jones, he certainly had first-hand knowledge of the store's operations at the time the Addendum was negotiated.  Armed with at least three months of operational experience involving substantially identical merchandise at the same store location, Mr. Jones could not have reasonably expected Grace Gems to fund the large payments owed to Ms. Patak.  Rather, Mr. Jones knew that the funding for his obligation must derive from other sources, including his retirement accounts.

In recognition of this reality, Mr. Jones committed to using his retirement accounts to pay the purchase price when he communicated with Ms. Patak in May 2014. Further, the record shows that his accounts were sufficiently funded at that time to cover his obligations.  Mr. Jones admits that when he met with Ms. Patak on July 21, 2014, he had access to enough funds to make the $100,000 payment.[150]  And according to his tax returns, Mr. Jones received IRA and pension distributions totaling nearly $350,000 in the year the Addendum payments were due.  Mr. Jones also made no effort to suggest that he was unable to access the retirement funds for any reason.  In consideration of these facts, the Court must conclude that Mr. Jones possessed the resources to satisfy Ms. Patak, but he simply refused to pay her.

Months after the Addendum default occurred, Mr. Jones suggests that he twice tried to make partial payments to Ms. Patak which she refused to accept.  The first involved an unsolicited offer by Mr. Jones to deposit $35,000 into Ms. Patak's account without her consent, and the second was a $10,000 check delivered to her in September 2015.  He claims the partial payments were good faith attempts to pay a portion of what he owed, demonstrating an intent to fulfill his obligations.  Ms. Patak testified that she did not accept the payments for fear they would be mistaken as full satisfaction of the APA and Addendum.  After examining the record, the Court does not find these attempted payments to be indicative of a genuine intent to pay Ms.

---

[150]     Vol. I Trans. at 164.

Patak in full.  In fact, Mr. Jones' offer to make a $35,000 deposit appears more akin to a "promise" than an actual "payment," and the $10,000 check was offered more than a year later, long after Ms. Patak sued him in state court.[151]  Considering the dubious circumstances by which these attempted payments were made, it does appear that Mr. Jones was seeking to establish new payment terms, even if they were not expressly offered in this manner.

In consideration of these factors, the Court finds that Ms. Patak proved by a preponderance of the evidence that Mr. Jones intentionally deceived her into signing the Addendum to her detriment.  Accordingly, Ms. Patak is entitled to judgment on this Count.

## IV.    CONCLUSION

In light of the foregoing, the Court finds the plaintiff, Ms. Patak, is entitled to judgment on Counts I, III, IV, and V of the *Amended Complaint*, and the defendant, Mr. Jones, is entitled to judgment on Count II.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Pittsburgh, Pennsylvania.

_____
GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Dated: April 1, 2020


Case administrator to mail to:
Debtor
Joseph Lavara, Esq.
Glenn R. Bartifay, Esq.

---

[151]      Ex. 10.